# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------

| | | |
|---|---|---|
| JOSEPH ZIMMERMAN, ANTHONY DEVITO, and SEAN DONNELLY, individually and on behalf of all others similarly situated, | ) ) ) ) ) | Case No. |
| | ) | |
| Plaintiffs, | ) ) | **CLASS ACTION COMPLAINT** |
| v. | ) ) | **JURY TRIAL DEMANDED** |
| | ) | |
| PARAMOUNT GLOBAL; COMEDY PARTNERS; and DOES 1-10, | ) ) ) ) | |
| Defendants. | ) | |

------------------------------------------------------

Joseph ("Joe") Zimmerman, Anthony DeVito, and Sean Donnelly ("Plaintiffs"), individually and on behalf of all others similarly situated, allege upon personal knowledge as to themselves and upon information and belief as to all other matters, based upon, inter alia, the investigation made by and through their attorneys, as follows:

## NATURE OF THE ACTION

1.      Plaintiffs and the putative class they seek to represent are professional comics. Plaintiffs and other class members customarily sign recording and/or distribution contracts with various companies (known as "record labels"), who in turn release, distribute and promote physical unit sales, digital downloads, and streaming audio consumption of sound recordings and audio-visual recordings of the comedians' comedy performances for sale to the public. Under amendments to the Copyright Act in 1995 and 1998 respectively, Plaintiffs and those similarly situated obtained the right to collect a royalty each time their work on a sound recording was publicly played via digital transmission. This includes, but is not limited to, digital satellite radio

broadcasters such as SiriusXM. This royalty was separate and distinct from the royalty the record label who released the sound recording was permitted to receive as a result of the amendments. For comics, many of whom make their living performing in nightclubs, theaters, arenas, bars, restaurants and other comedy venues across the nation, this additional revenue stream is critical for sustaining their careers and feeding their families. This reality was never more apparent than during 2020 and 2021, when shutdowns related to COVID-19 cut off comics' ability to perform publicly, leaving many with only their royalty revenue streams to make ends meet.

2.      This action arises from Defendants' Paramount Global, and their entity Comedy Partners, ("Defendants," "Comedy Partners," or the "Company") efforts to wrongfully commandeer Plaintiffs' royalties in contravention of both the parties' recording agreements and the law. Defendants engaged in undisclosed direct licensing agreements with entities such as SiriusXM without Plaintiffs' knowledge or consent. Defendants' agreements usurped Plaintiffs' royalties while, on information and belief, increasing Defendants' royalties beyond what they were statutorily entitled to receive. If, as Lenny Bruce once said, comedy is the "only honest art form," Defendants' unlawful exploitation of that art stands in stark contrast. Plaintiffs pursue this Action on behalf of themselves and those similarly situated to redress this wrong.

3.      Defendants comprise a leading global media and entertainment company that creates content and experiences for audiences worldwide. Paramount Global's portfolio includes, among others, Comedy Central, which is a cable television channel and a "leading brand for comedy stand-up specials, sketch shows, adult animation, late-night programming, and more."[1] Comedy Partners primarily acquires the rights to distribute comedic performances by: (1) signing artists such as the Plaintiffs in this matter to agreements whereby Comedy Partners acquires the

---

[1] https://www.cc.com/

2

rights to exploit the artist's Recordings (hereinafter "Recording Agreements"); and (2) entering into distribution agreements with other distributors whereby Comedy Partners agrees to distribute the recordings for the distributor (hereinafter "Distribution Agreements").

4.     The Recording Agreements between Comedy Partners, Plaintiffs, and others similarly situated Class Members[2] include "Profit Participation" provision(s), which grant to the artist a share of the company's net profits earned in connection with the exploitation of the Recordings delivered.

5.     The Recording Agreements between Comedy Partners, Plaintiffs, and the Class Members further require Comedy Partners to accurately account for all net profits generated under the Recording Agreements, and pay a portion of the net profits to Plaintiffs and the Class Members in accordance with the terms of the Recording Agreements.

6.     In violation of the Class Member Contracts, Defendants entered into undisclosed negotiations and direct licensing agreements with satellite radio provider SiriusXM Radio ("SiriusXM") and potentially other parties[3], for the exploitation of Plaintiffs' and the Class Members' intellectual property. Defendants have systematically failed to disclose, account for, or pay the full amount owed of the revenue generated from the exploitation of the Class Members' comedic musical performances on SiriusXM as provided for in the Recording Agreements.

7.     Plaintiffs bring this nationwide class action on behalf of themselves and similarly situated Class Members arising from Defendants' failure to disclose, account for, and pay revenues generated for direct licensing agreements of Plaintiffs' and the Class Members' comedic

---

[2] The term "Class Members" refers collectively to Plaintiffs and to persons who fall within the scope of the Class defined in this Complaint.

[3] Due to Defendants' failure to properly report and pay revenue as outlined below, it is currently unknown whether there are entities other than SiriusXM from whom Defendants are collecting DEMD revenue.

performances with SiriusXM and other digital media outlets. Plaintiffs bring claims seeking payment for royalties owed under the Digital Millennium Copyright Act, for breach of contract, direct violation of the Digital Millennium Copyright Act, breach of fiduciary duty, breach of the implied covenant of good faith and fair dealing, money had and received, accounting, and for declaratory relief. Plaintiffs seek monetary damages, punitive damages where appropriate, injunctive, and/or declaratory relief on behalf of themselves and others similarly situated against Defendants.

## **VENUE AND JURISDICTION**

8.      This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, 2201 and 42 U.S.C. § 12188. This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

9.      Plaintiffs' claims asserted herein arose in this judicial district, as Plaintiffs Joe Zimmerman, Anthony DeVito, and Sean Donnelly reside in this judicial district. Defendants are registered, has its corporate headquarters, and do substantial business in New York.

10.     This Court also has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1322(d), because at least one class member is of diverse citizenship from Defendants, and there are more than 100 class members, and the aggregate amount in controversy exceeds $5,000,000.00.

11.     Venue in this judicial district is proper under 28 U.S.C. § 1391(b)(2). Defendants are subject to personal jurisdiction in this District because Defendants do substantial business in this District, and a substantial part of the events or omissions giving rise to these claims occurred in this District. Defendants engaged in the extensive promotion, marketing, distribution, and sales of the goods and services at issue in this District.

## PARTIES

### Plaintiff Joe Zimmerman

12.     Plaintiff Joe Zimmerman ("Zimmerman") is and was, for all relevant times hereto, a resident of New York, New York. On or about August 31, 2017, Zimmerman executed an Exclusive Recording Agreement with Comedy Partners. A true and correct copy of Zimmerman's Recording Agreement is attached hereto as **Exhibit A**. (Ex. A, ¶ 5.)

13.     Under the Recording Agreement, Zimmerman recorded one album in 2018 entitled "Innocence" consisting of twenty-four (24) tracks.

14.     Under the section of the Recording Agreement entitled "Ownership," the Agreement carves out Zimmerman's reserved rights by stating that "[s]ubject to Artist's right to retain ownership in Artist's underlying comedy/performance material and Artist's music compositions provided to Company in connection with the Recordings on a royalty-free, gratis basis in perpetuity ("Reserved Rights"), each Recording recorded during the Term or delivered hereunder and all reproductions derived therefrom shall be deemed to be works made for hire for Company." (Ex. A, ¶ 7.) Thus, though the language of the Recording Agreement characterizes his delivered recordings as works made for hire, the Recording Agreement also concedes that Zimmerman, as the Artist, retains certain rights, most notably here—the right to own and publicly perform his material and collect royalties from third parties based on the public performance of his works.

15.     Zimmerman's Recording Agreement further provides that Defendants will account to him for his share of Defendant's "Net Profits" earned in connection with the exploitation of the Recordings delivered per the contract on a per album basis. Defendants were required to account to Zimmerman for his profit participation "semi-annually, within ninety (90) days of the end of

December 31 and June 30 and shall commence with the first full reporting period" pursuant to the provisions of the Recording Agreement. (*See* Ex. A, ¶ 6.)

16.     Critically, nowhere in the Recording Agreement Defendants drafted and presented to Zimmerman did they disclose that Defendants has a direct licensing agreement with SiriusXM (or other digital media outlets), or that Zimmerman's right to receive the featured artist share of statutory royalties for the public performance of the master recording through SoundExchange would be negated by the terms of Defendants' direct license(s). SoundExchange is the exclusive organization authorized by the United States Congress to collect and distribute digital performance royalties on behalf of over 245,000 recording artists' and master rights owners.

17.     The Recording Agreement also did not indicate that Zimmerman was transferring his featured artist share of digital public performance royalties to Defendants. Rather, the Recording Agreement permitted Zimmerman to retain "ownership in [his] underlying comedy/performance material and … music compositions." Zimmerman's retention of ownership permitted him to publicly perform the comedy performance material and collect his share of the royalties based on that public performance. Zimmerman's retention of the public performance portion of the copyright extends to audio streaming via a digital transmission over satellite radio such as SiriusXM radio. *Capitol Records, LLC v. ReDigi Inc*. (S.D.N.Y. 2013) 934 F.Supp.2d 640, 652, aff'd (2d Cir. 2018) 910 F.3d 649 ("[A]udio streams are [public] performances because a "stream is an electronic transmission that renders the musical work audible as it is received by the client-computer's temporary memory. This transmission, like a television or radio broadcast, is a performance because there is a playing of the song that is perceived simultaneously with the transmission."), citing *United States v. Am. Soc. Of Composers, Authors, & Publishers*, 627 F.3d 64, 74 (2d Cir. 2010). Following Zimmerman's entry into the Recording Agreement, Defendants

have failed to adhere to the accounting terms and have not issued Zimmerman full and regular accountings as provided for in Paragraph 6 of the Recording Agreement. (*See* Ex. A, ¶ 6.)

18.     Defendants further failed to provide any accounting of the individual SiriusXM performances ("spins") despite Zimmerman's album (and individual tracks therefrom) being played regularly across three different SiriusXM stations. With Zimmerman's previous albums, which were released on other labels, Zimmerman's public performance royalties were clearly accounted for and paid by SoundExchange. Upon contacting Defendants in 2021 on this issue, through the assistance of legal counsel, Zimmerman received a statement, Invoice # CCR-JOZ123120A dated March 31, 2021. A true and correct PDF copy of statement is attached hereto as **Exhibit B**. Under the "Balance" section,[4] Defendants calculated Zimmerman's "Ending balance" for the inception of his album in 2019 until December 31, 2020 as $693.60. (*Id.*) Under the "Balance" section, for the line item labeled "Sirius XM," Defendants calculated the value for the inception of his album until December 31, 2020 as "$5,210.81." Zimmerman later received an additional statement, Invoice # CCR-JOZI123121A, dated March 31, 2022, calculating balances from the inception of Zimmerman's album through the end of 2021. A true and correct PDF copy of this statement is attached hereto as **Exhibit C.** As with Exhibit B, under the "Balance" section of **Exhibit C**, for the line item labeled "Sirius XM," Defendants calculated the value for the inception of his album until December 31, 2021 as "$6,955.92." Defendants thus do not contest that Zimmerman is owed something for royalties flowing from the use of his material on SiriusXM. Zimmerman, however, contends that the amount he has thus received is substantially less than he would have been entitled to for a statutory license, or in the alternative, and on information and

---

[4] Ending Balance was calculated as "Gross Receipts" minus "Deductions," with 50% Artist share applied, then less "Advances," "CD orders" and "Prior Payments."

belief, less that should have otherwise been provided under a direct license with a full and proper accounting.

19.     Using ShineX Monitoring, an independent royalty calculator that calculates and tracks satellite digital audio radio services ("SDARS") royalties from SiriusXM, Zimmerman determined the actual figures owed were significantly larger than those reported by Defendants. For example, according to ShineX monitoring, from the time period between March 1, 2020 until June 30, 2020, inclusive, his "Innocence" album had a total of 744 SiriusXM spins and had earned $15,964.00 in SDARS royalties.[5] From July 1, 2020 through December 31, 2020, his "Innocence" album had a total of 1,411 SiriusXM spins and had earned $30,607.00 in SDARS royalties. The data from ShineX monitoring shows Zimmerman's "Innocence" album had a total of 1,203 SiriusXM spins and had earned $25,563.00 between January 1, 2021 and June 30, 2021. In light of this, Defendants' calculation that Zimmerman was owed only $5,210.81 from SiriusXM generated from the inception of the album until the end of 2020, and that Zimmerman was owed only $6,955.92 from inception until the end of 2021, is entirely at odds with the ShineX Monitoring figures. As Zimmerman is, upon information and belief, one of the top comics played on SiriusXM radio stations, this discrepancy is striking. True and correct copies of screenshots of Zimmerman's ShineX Monitoring statements are attached hereto as **Exhibit D.**

**Plaintiff Anthony DeVito**

20.     Plaintiff Anthony DeVito ("DeVito") is and was, for all relevant times hereto, a resident of New York, New York. On or about January 9, 2017, DeVito executed an Exclusive

---

[5] Plaintiff Zimmerman notes that his "Innocence" album spun regularly for an additional eleven (11) months before ShineX Monitoring was even available to artists, thus meaning that actual figures of spins and earnings are higher than those accounted for by ShineX Monitoring.

Recording Agreement with Comedy Partners. A true and correct copy of DeVito's Recording Agreement is attached hereto as **Exhibit E**. (Ex. E, ¶ 5.)

21.     Under the Recording Agreement, DeVito recorded one album in 2017 entitled "Dream Occupation" consisting of thirteen (13) tracks.

22.     As with Zimmerman's Recording Agreement under the section of the Recording Agreement entitled "Ownership," the Agreement carves out DeVito's reserved rights by stating that "[s]ubject to Artist's right to retain ownership in Artist's underlying comedy/performance material and Artist's music compositions provided to Company in connection with the Recordings on a royalty-free, gratis basis in perpetuity ("Reserved Rights"), each Recording recorded during the Term or delivered hereunder and all reproductions derived therefrom shall be deemed to be works made for hire for Company." (Ex. E, ¶ 7.) Thus, though the language of the Recording Agreement characterizes DeVito's delivered recordings as works made for hire, the Recording Agreement also concedes that DeVito, as the Artist, retains certain rights, most notably here—the right to own and publicly perform his material and collect royalties from third parties based on the public performance of his works.

23.     DeVito's Recording Agreement further provides that Defendants will account to him for his share of Defendant's "Net Profits" earned in connection with the exploitation of the Recordings delivered per the contract on a per album basis. Defendants were required to account to DeVito for his profit participation "semi-annually, within ninety (90) days of the end of December 31 and June 30 and shall commence with the first full reporting period" pursuant to the provisions of the Recording Agreement. (*See* Ex. E, ¶ 6.)

24.     Critically, nowhere in the Recording Agreement Defendants drafted and presented to DeVito did they disclose that Defendants have a direct licensing agreement with SiriusXM (or

other digital media outlets), or that DeVito's right to receive statutory royalties through SoundExchange would be negated by the terms of Defendants' direct license(s). SoundExchange is the exclusive organization authorized by the United States Congress to collect and distribute digital performance royalties on behalf of over 245,000 recording artists' and master rights owners.

25.     The Recording Agreement also did not indicate that DeVito was transferring his featured artist share of digital public performance royalties to Defendants. Rather, just as with Zimmerman's Recording Agreement, the Recording Agreement permitted DeVito to retain "ownership in [his] underlying comedy/performance material and … music compositions." (Ex. E, ¶ 7.) DeVito's retention of ownership permitted him to publicly perform the comedy performance material and collect his share of the royalties based on that public performance.

26.     Following DeVito's entry into the Recording Agreement, Defendants have failed to adhere to the accounting terms and have not issued DeVito full and regular accountings as provided for in Paragraph 6 of the Recording Agreement. (*See* Ex. E, ¶ 6.)

27.     Defendants further failed to provide any accounting of the individual SiriusXM performances ("spins") despite DeVito's album (and individual tracks therefrom) being played regularly across at least two different SiriusXM stations.

**Plaintiff Sean Donnelly**

28.      Plaintiff Sean Donnelly ("Donnelly") is and was, for all relevant times hereto, a resident of New York, New York. On or about July 22, 2015, Donnelly executed an Exclusive Recording Agreement Comedy Partners. A true and correct copy of Donnelly's Recording Agreement is attached hereto as **Exhibit F**. (Ex. F, ¶ 5.)

29.      Under the Recording Agreement, Donnelly recorded one album in 2015 entitled "Manual Labor Face" consisting of nineteen (19) tracks.

30.     As with Zimmerman's and DeVito's Recording Agreement under the section of the Recording Agreement entitled "Ownership," the Agreement carves out Donnelly's reserved rights by stating that "[s]ubject to Artist's right to retain ownership in Artist's underlying comedy/performance material and Artist's music compositions provided to Company in connection with the Recordings on a royalty-free, gratis basis in perpetuity ("Reserved Rights"), each Recording recorded during the Term or delivered hereunder and all reproductions derived therefrom shall be deemed to be works made for hire for Company." (Ex. F, ¶ 7.) Thus, though the language of the Recording Agreement characterizes Donnelly's delivered recordings as works made for hire, the Recording Agreement also concedes that Donnelly, as the Artist, retains certain rights, most notably here—the right to own and publicly perform his material and collect royalties from third parties based on the public performance of his works.

31.     Donnelly's Recording Agreement further provides that Defendants will account to him for his share of Defendant's "Net Profits" earned in connection with the exploitation of the Recordings delivered per the contract on a per album basis. Defendants were required to account to Donnelly for his profit participation "semi-annually, within ninety (90) days of the end of December 31 and June 30 and shall commence with the first full reporting period" pursuant to the provisions of the Recording Agreement. (*See* Ex. F, ¶ 6.)

32.     Critically, nowhere in the Recording Agreement Defendants drafted and presented to Donnelly did they disclose that Defendants has a direct licensing agreement with SiriusXM (or other digital media outlets), or that Donnelly's right to receive statutory royalties through SoundExchange would be negated by the terms of Defendants' direct license(s). SoundExchange is the exclusive organization authorized by the United States Congress to collect and distribute digital performance royalties on behalf of over 245,000 recording artists' and master rights owners.

33.    The Recording Agreement also did not indicate that Donnelly was transferring his featured artist share of digital public performance royalties to Defendants. Rather, just as with Zimmerman's and DeVito's respective Recording Agreements, the Recording Agreement permitted Donnelly to retain "ownership in [his] underlying comedy/performance material and … music compositions." (Ex. F, ¶ 7.) Donnelly's retention of ownership permitted him to publicly perform the comedy performance material and collect his share of the royalties based on that public performance.

34.    Following Donnelly's entry into the Recording Agreement, Defendants have failed to adhere to the accounting terms and have not issued Donnelly full and regular accountings as provided for in Paragraph 6 of the Recording Agreement. (*See* Ex. F, ¶ 6.)

35.    Defendants further failed to provide any accounting of the individual SiriusXM performances ("spins") despite Donnelly's album (and individual tracks therefrom) being played regularly across at least two different SiriusXM stations.

36.    As outlined in further detail below, Defendants have concealed from Plaintiffs and other similarly situated comics the existence of a pre-existing, secret direct licensing agreement between SiriusXM and potentially other third parties that impermissibly sought to usurp the public performance royalties they would have otherwise been permitted to receive at the statutory rate through SoundExchange. Plaintiffs are further informed and believe that to the extent Defendants entered into such direct licensing agreements without their knowledge or consent, and collected their public performance royalties, Defendants have systematically failed to account for and pay Plaintiffs and other similarly situated comics for these royalties, or in the alternative a proper amount of the royalties collected, in further violation of the recording agreements Defendants

entered into with Plaintiffs, and have wrongfully retained royalties to which Plaintiffs and the putative class members are entitled.

## DEFENDANTS

### Paramount Global / Comedy Partners

37.     Defendant Paramount Global a Delaware corporation whose principal place of business is located in New York, New York.

38.     Defendant Comedy Partners is a New York general partnership and a subsidiary of Paramount Global which has its principal place of business located in New York, New York. Comedy Partners operates the network television channel "Comedy Central" and the record label "Comedy Central Records" through which Comedy Partners produces comedy albums.

39.     At all relevant times, Defendants were and continue to be in several lines of business in the entertainment field, including the business of exploiting and distributing the music and other recordings made by recording artists, specifically, comedians, services for which Plaintiffs and the Class Members contracted with Defendants.

40.     Plaintiffs are informed and believe, and based thereon allege, that at all times herein relevant, each of the Defendants were the alter ego, agent, servant, representative and employee of the remaining Defendants, and in doing the things hereinafter alleged, each was acting within the course and scope of said agency and employment and with the ratification and authorization of their respective principals.

## COMMON ALLEGATIONS

### Under Defendants' Agreements with Class Members, Class Members Reserved Certain Rights That Permitted Them To Directly Receive Revenues From SoundExchange for Digital Media Exploitation—Including Royalties from SDARS Such As SiriusXM

*Statutory Background and Collection of Royalties by SoundExchange*

41.     In 1995, the Copyright Act was amended via the Digital Performance Right in Sound Recording Act to begin addressing the digital transmission of music. It provided sound recordings a limited public performance right in digital media and the transmissions thereof that did not exist previously for master sound recordings. In 1998, the Copyright Act was further amended by the Digital Millennium Copyright Act ("DMCA"). The DMCA further amended the scope of the public performance right. As a result of these enactments, artists and copyright owners (i.e. record labels) are *each* legally entitled to receive royalties for digital public performances of recordings, including SiriusXM. The right of both artists and copyright owners to separately receive public performance royalties for digital public performances did not previously exist in the law.

42.     The royalties for a digital public performance are determined according to federally-approved statutory license rates. By law, and absent an agreement between the parties, these royalties are generated pursuant to a statutory license and collected on behalf of and distributed to rights holders by SoundExchange.

43.     More specifically, 17 U.S.C. § 114 provides a statutory license to perform and reproduce sound recordings to certain digital services. The section 114 statutory license covers public performances by four classes of digital music services: eligible non-subscription services (i.e., non-interactive webcasters and simulcasters that do not charge any fee), pre-existing subscription services (i.e., residential subscription services which began providing music over

digital cable or satellite television before July 1998), new subscription services (i.e., noninteractive webcasters and simulcasters that charge a fee, as well as residential subscription services providing music over digital cable or satellite television since July 1998), and pre-existing satellite digital audio radio services ("SDARS") (i.e., SiriusXM Radio).[6]

44.     The royalty rates to be paid by these services in exchange for digital play of sound recordings pursuant to the statutory license are determined by the Copyright Royalty Board ("CRB"), a tribunal of three judges established by the Copyright Royalty and Distribution Reform Act of 2004. Pursuant to 37 C.F.R. § 262.4, SoundExchange, an affiliate and former subsidiary of the Recording Industry Association of America, has been designated as the sole entity in the United States authorized to collect these royalties from statutory licensees for digital performances of sound recordings.

45.     Under 17 U.S.C. § 114(g)(2)(A), the royalties collected by SoundExchange from satellite radio, non-interactive webcasting, cable TV music channels, and other digital services transmitting sound recordings must be distributed by it as follows:

> (2) An agent designated to distribute receipts from the licensing of transmissions in accordance with subsection (f) [SoundExchange] shall distribute such receipts as follows:
>
> > (A)  50 percent of the receipts shall be paid to the copyright owner of the exclusive right under section 106(6) of this title to publicly perform a sound recording by means of a digital audio transmission.
> >
> > (B)  2 ½ percent of the receipts shall be deposited in an escrow account managed by an independent administrator jointly appointed by copyright owners of sound recordings and the American Federation of Musicians (or any successor entity) to be distributed to nonfeatured musicians (whether or not members of the American Federation of Musicians) who have performed on sound recordings.
> >
> > (C)   2 ½ percent of the receipts shall be deposited in an escrow account managed by an independent administrator jointly appointed by copyright owners of sound recordings and the American Federation of Television and Radio Artists (or any

---

[6] https://www.soundexchange.com/service-provider/licensing-101/

successor entity) to be distributed to nonfeatured vocalists (whether or not members of the American Federation of Television and Radio Artists) who have performed on sound recordings.

(D) 45 percent of the receipts shall be paid, on a per sound recording basis, to the recording artist or artists featured on such sound recording (or the persons conveying rights in the artists' performance in the sound recordings). 17 U.S.C. § 114(g)(2) (emphasis added).

Under 17 U.S.C. §114(g), 50% of digital performance royalties are payable to the copyright owners of the sound recordings, 45% are payable to the featured artists ("Featured Artist Share"), 2.5% are payable to the non-featured musicians (session musicians) and 2.5% are payable to the non-featured vocalists (session vocalists) (session musicians and session vocalists are sometimes collectively referred to herein as "non-featured performers").

46.      Section 114(g)(2)(A) refers to 17 U.S.C.A. § 106(6), which states that "the owner of the copyright under this title has the exclusive rights to do and to authorize any of the following: (6) in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission."

47.      Class Members are featured artists on their respective recordings and are among the persons granted a right to receive the 45% Featured Artists Share royalties for the public performance of the copyrighted work via digital transmission under 17 U.S.C. § 114(g)(2)(D).

48.      The term "featured artist" as referenced in 17 U.S.C. §114(g) refers to the individual(s) or group(s) most prominently featured on a track or album.[7] The Featured Artist Share is to compensate the featured artist for the public performance of the master sound recording via digital transmission. The Featured Artist Share is collected by SoundExchange and paid directly to the artist, not the label.[8] The Featured Artist Share is payable to the artists by

---

[7] https://www.soundexchange.com/artist-copyright-owner/
[8] https://www.soundexchange.com/artist-copyright-owner/digital-royalties/

SoundExchange irrespective of whether the artist has recouped any advance provided by the label to create the sound recording. SoundExchange does not permit the Featured Artist Share to be transferred to the label, even under a letter of direction ("LOD") signed by the Featured Artist.[9] Thus, artists, the Class Members, rightly had the understanding at the time they entered into recording agreements with Defendants that the Featured Artist share would be payable directly to them by SoundExchange for digital transmissions, including those over SiriusXM, and that Defendants would have no right or entitlement to the Featured Artist Share.

49.     Indeed, under the Recording Agreements entered into by the Class Members with Defendants, the Class Members expressly reserved the right to retain ownership in their "underlying comedy/performance material and Artist's music compositions." This included the right to publicly perform the material and collect public performance royalties, including the Featured Artist Share for the public performance of digital transmissions under 17 U.S.C. § 114(g)(2)(D).

**Under Defendants' Agreements with Class Members, Defendants Were Required to Accurately Account For and Pay Class Members for Revenues Received from the Digital Media Exploitation of the Master Recording —Including Royalties from SDARS Such As SiriusXM**

50.     Further, under the terms of the Recording Agreements, Defendants promised to account to Class Members for their Artists' Shares in the Company's "Net Profits" in connection with the exploitation of the Recordings delivered by the Class Members. The Agreements allow Defendants to use their considerable market power to reproduce and distribute the Class Members' intellectual property pursuant to 17 U.S.C.A. § 106 (1), (3), and (6) through various media, including but not limited to selling hard copy records (e.g., CDs, vinyl), and Digital

---

[9] https://www.soundexchange.com/about/general-faqs/letter-direction-faqs/

Entertainment Media Distribution ("DEMD") such as digital downloads (e.g., iTunes, Amazon), streaming (e.g., Spotify, Pandora), and digital satellite radio (e.g., SiriusXM).

51.     In exchange for these reproduction and distribution rights, each of the Agreements placed the following obligations upon Defendants. First, Defendants were required to account for Artist's profit participation semi-annually from the exploitation of the recordings generated from DEMD to the Class Members. Second, Defendants were required to pay Class Members a portion of the revenues from the distribution of recordings, including distribution from DEMD in accordance with the Agreements.

52.     Each of the Agreements contains a New York choice of law provision.

**Defendants Withheld Revenues From Sirius XM in Violation of the Contracts Resulting in Substantial Damages to the Class Members**

53.     On information and belief, Defendants negotiated and entered into a undisclosed direct licensing agreement for SiriusXM and potentially other third-parties that impermissibly transferred Class Members' Featured Artist Share of public performance royalties without their knowledge or consent. It is further believed that in doing so, Defendants accepted a lower rate for Class Members' Featured Artists Share than they would have otherwise received and been paid by SoundExchange pursuant to statute. More specifically, on information and belief, Defendants offered SiriusXM and potentially other third-parties a discount on the Featured Artist Share that would have otherwise been due to Class Members in exchange for paying Defendants a higher share of royalties than they would have otherwise received by statute, which wrongfully usurped the Class Members' exclusive rights pursuant to 17 U.S.C.A. § 106 (6).

54.     Defendants had a legal obligation under the Agreements with Class Members to: 1) disclose the existence of any direct licensing deal that would affect the ability to receive the Featured Artist Share, and 2) to properly and accurately account for and pay the net revenue

received by Defendants. On information and belief, rather than fulfilling their contractual obligations, Defendants have systematically, knowingly, and intentionally failed to disclose the existence of its direct licensing agreements, and failed to account for and pay revenue generated from direct licensing agreements with SiriusXM and potentially other parties to Class Members, resulting in an egregious, wrongful reduction of Class Members' income.

55.     As a result of Defendants' conduct, Class Members have not received the Featured Artist Share they would have otherwise been entitled to be paid at the statutory rate. Further, the entirety of the revenue that Defendants have collected from SiriusXM and potentially other parties has never been reported and properly paid to Class Members, but instead has been wrongfully retained by Defendants.

56.     Defendants have engaged in this conduct even though they have no contractual or legal right to do so based on the terms of the Recording Agreements. Absent a specific contractual assignment of rights, any Class Member's rights under U.S. Copyright Law is assumed to be reserved by Class Members.

57.     Defendants have wrongfully retained monies owed to the Class Members, which could otherwise easily be accounted for and paid as required by the Recording Agreements.

58.     On information and belief, even if Defendants are not themselves wrongfully retaining monies that are owed to Class Members, Defendants are receiving some manner of separate benefit from their arrangement with SiriusXM such that there is a mutual benefit for SiriusXM and Defendants, at the expense of Class Members receiving statutory royalties for their Featured Artist Share at a higher rate through SoundExchange.

59.     As a result of Defendants' systematic and continuous breach of their contractual obligations to the Class Members to properly disclose, account for, credit and pay the revenue

generated from the distribution of Class Members' recordings, Defendants have caused substantial damages to the Class Members. Defendants' practices, as alleged herein, have resulted in obstructing and/or wrongfully withholding of a substantial amount of money owed to Class Members.

**Defendants Are Equitably Estopped from Asserting a Statute of Limitations Defense**

60.     Defendants' conduct, as alleged herein, prevented Class Members from filing suit until the present. On information and belief, Defendants and SiriusXM entered into a secret agreement whereby one or both parties, Defendants and/or SiriusXM, improperly benefitted from the Class Members' recordings, without the Class Members' knowledge. Due to the secret nature of this agreement and conduct by Defendants, Class Members did not and could not know that they had a potential claim against Defendants for this conduct, nor could Class Members, who reasonably rely on the legitimacy and accuracy of accounting statements and payments from SoundExchange, be reasonably expected to realize that any such claim existed. Defendants intentionally kept the agreement with and revenues generated from SiriusXM (and potentially other distributors) a secret to avoid paying revenues generated under these agreements to the Class Members, to the Class Members' detriment.

61.     At all relevant times, Defendants knew that they were improperly collecting revenues that they were not entitled to collect, and thereafter, intentionally concealing such revenue from Class Members and failing to account to and pay Class Members what the Class Members were owed. Defendants have not reported to Class Members that they have been collecting performance royalties directly from SiriusXM, and thus purposely concealed and withheld the existence of these revenues from Plaintiffs in violation of Defendants' contractual obligations. Class Members reasonably relied on Defendants' accounting statements and reports,

when such statements or reports were even provided, to their detriment. Class Members did not know, and could not have reasonably known, that Defendants had entered into a secret agreement to collect revenues from SiriusXM, without reporting such revenues to the Class Members.

## CLASS ASSERTIONS

62.     Plaintiffs bring this class action pursuant to Fed. R. Civ. P. 23(a), 23(b)(2) and 23(b)(3) on his own behalf and on behalf of the following Class:

> All persons and entities, their agents, successors in interest, assigns, heirs, executors, trustees, and administrators who are or were parties to Recording Agreements with Comedy Partners LP and/or Comedy Partners US LP that included Digital Entertainment Media Distribution rights, and whose Recordings were played on SiriusXM.

63.     The following persons and entities shall be excluded from the Class: (a) Defendants Comedy Partners and their subsidiaries, affiliates, officers, and employees; (b) all persons who make a timely election to be excluded from the proposed Class; (c) governmental entities; and (d) the judge(s) to whom this case is assigned and any immediate family members thereof.

64.     Plaintiffs reserve the right to redefine the Class prior to certification.

65.     This action is properly maintainable as a class action.

**Numerosity**

66.     The Class for whose benefit this action is brought is so numerous that joinder of all Class Members is impracticable. While Plaintiffs do not presently know the exact number of Class Members, Plaintiffs are informed and believe that there are hundreds of Class Members, and that those Class Members can only be determined and identified through Defendants' records and, if necessary, other appropriate discovery.

**Commonality**

67.     There are questions of law and fact which are common to Class Members and which predominate over any questions affecting only individual members of the Class. A class action will generate common answers to the below questions, which are apt to drive the resolution of the litigation:

a.     whether Plaintiffs' retention of the public performance of their copyright permitted them to collect their Featured Artist Share for the public performance of the master recording via digital transmission;

b.     whether Defendants breached the recording agreements by, inter alia, withholding and/or failing to account for and pay revenues generated via digital transmission from SiriusXM and potentially other entities to Plaintiffs and the Class Members;

c.     whether Defendants violated the copyright act by assigning to SiriusXM and potentially others, Plaintiffs' public performance rights under the Copyright Act without their consent;

d.     whether Defendants benefited financially from their wrongful acts;

e.     whether Defendants will continue to withhold income derived from DEMD revenues while knowing that such conduct constitutes, at minimum, a breach of the Agreements, if not outright fraud and a violation of applicable federal law;

f.     whether Defendants, by way of the conduct alleged herein, must provide a proper accounting of the amounts owed to Plaintiffs and other Class Members;

g.     whether declaratory and injunctive relief are appropriate to curtail Defendants' conduct as alleged herein;

h.      whether Plaintiffs and other Class Members have been damaged by Defendants' actions or conduct; and

i.      the proper measure of damages.

**Typicality**

68.     Plaintiffs' claims are typical of the claims of the members of the proposed class. The claims of Plaintiffs and members of the class are based on the same legal theories and arise from the same unlawful conduct.

**Adequacy**

69.     Plaintiffs are committed to prosecuting this action and have retained competent counsel experienced in litigation of this nature. Plaintiffs have no interests that are antagonistic to, or in conflict with, the interests of the other members of the Class. Plaintiffs are adequate representatives of the Class and will fairly and adequately protect the interests of the Class. Plaintiffs' undersigned counsel have extensive experience in successfully litigating federal class action lawsuits in this Court and in federal courts throughout the country.

70.     The prosecution of separate actions by individual Class Members could create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which could establish incompatible standards of conduct for Defendants or adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the members of the Class not parties to the adjudications.

71.     Furthermore, as the damages suffered by some of the individual Class Members may be relatively small, the expense and burden of individual litigation make it impracticable for the individual members of the Class to redress the wrongs done to them individually. If a class

action is not permitted, Class Members will continue to suffer losses and Defendants' misconduct will continue without proper remedy.

72.     Defendants have acted and refused to act on grounds generally applicable to the entire Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

73.     Plaintiffs anticipate no unusual difficulties in the management of this litigation as a class action.

74.     For the above reasons, a class action is superior to other available methods for the fair and efficient adjudication of this action.

## **CLAIMS FOR RELIEF**

## **FIRST CLAIM**

**(Declaratory Judgment re Violation of 17 U.S.C.A. § 114(g)(2)(D); 17 U.S.C.A. § 106(6))**
**(On Behalf of Plaintiffs and All Class Members)**

75.     Plaintiffs repeat and reallege each and every allegation contained in the paragraphs above as though fully set forth herein.

76.     Defendants refuse to account and pay for Plaintiffs' and the Class Members' share of revenue from the exploitation of the works generated from DEMD, including SiriusXM.

77.     By reason of the foregoing, an actual, genuine and justiciable controversy exists between the parties that can only be resolved by declaratory relief. In accordance with the provisions of 28 U.S.C. §§ 2201 and 2202, and the terms and provisions of the U.S. Copyright Law, as a result of Defendants' refusal to account for and pay for Plaintiffs' and the Class Members' share of revenue from the exploitation of the works generated from DEMD, including

SiriusXM, it has become necessary to request that the Court make a declaration as to the rights and other legal relations of the parties.

78.     Plaintiffs and the Class Members seek a judgment declaring the parties' respective rights with regard to Plaintiffs' and the Class Members' share of revenue from the exploitation of the works generated from DEMD, including SiriusXM, including a declaration that Defendants are not entitled to recoup against or otherwise benefit from a diversion of Plaintiffs' share of revenue derived from such exploitation.

79.     Plaintiffs seek adjudication of an actual controversy in connection with Defendants' breaches of contract and their wrongful retention of Plaintiffs' and the Class Members' funds. Pursuant to the Agreements, Defendants have a continuing obligation to: (1) account for and report all revenue from the exploitation of the works generated from DEMD, including SiriusXM, to Plaintiffs and the Class Members; (2) pay Plaintiffs and the Class Members a portion of the revenues from the distribution of the Recordings, including distribution from DEMD, including SiriusXM, in accordance with the Agreements; and (3) be enjoined from claiming to represent Plaintiffs' and Class Members or making any agreement in connection with the payment or collection of the featured artist share of digital performance royalties due from SoundExchange.

80.     Plaintiffs and other Class Members have no adequate remedy at law.

81.     Plaintiffs' claim presents a justiciable controversy because Plaintiffs and the Class Members will continue to be deprived of their funds as a result of Defendants' wrongful exercise of control and retention of such funds. Plaintiffs seek the Court's determination as to whether Defendants are entitled to collect Plaintiffs' and the Class Members' funds, and even if they are, whether Defendants are entitled to retain 100% of such monies without providing an accounting to the Class Members, and paying Class Members any percentage of such monies.

82.     By reason of the foregoing, there is a present and ongoing controversy between Plaintiffs and other Class Members, on the one hand, and Defendants, on the other hand, with respect to which this Court should enter a declaratory judgment determining that Defendants are not permitted to collect the revenues owed to Plaintiffs and the Class Members, and are not permitted to retain such revenues.

83.     If declaratory relief is not granted, Defendants will continue to wrongfully assert exclusive right to Plaintiffs' and the Class Members' revenues.

## SECOND CLAIM

### (Direct Violation of 17 U.S.C.A. § 114(g)(2)(D); 17 U.S.C.A. § 106(6)) (On Behalf of Plaintiffs and All Class Members)

84.     Plaintiffs repeat and reallege each and every allegation contained in the paragraphs above as though fully set forth herein.

85.     This claim for relief arises under 17 U.S.C. §§ 106(6) and 114(g)(2)(D).

86.     At all times relevant, Plaintiffs have been the respective owners of the exclusive rights provided by 17 U.S.C. section 106(6)—"in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission."

87.     Plaintiffs' copyrighted works of the comedic performance material are original works of authorship constituting copyrightable subject matter within the meaning of 17 U.S.C. § 102.

88.     The specific original works that are the subject of this Action are as follows:

a. Joe Zimmerman – 2018 album entitled "Innocence" consisting of twenty-four (24) tracks.

   1.  Opening Remarks

   2.  New Year's

3.  Happiness

4.  Smart Phones

5.  Power Cycling

6.  Persistence

7.  Personal Trainer

8.  Scorpio / Libra

9.  Elections

10.  Name Game

11.  Disney

12.  Taxes

13.  Baby

14.  Stars v. Sand

15.  Early Human

16.  Chupacabra

17.  Car Accident

18.  Self-Help

19.  Crows

20.  YouTube

21.  Doomsday

22.  Garage Cricket

23.  Lasik

24.  Innocence Game

b.   Anthony DeVito – 2017 album entitled "Dream Occupation" consisting of thirteen (13) tracks.

1.   Hi, I'm Anthony

2.   This is Vicky, that's Frank

3.   I had a weird childhood

4.   Then, I went to college

5.   Next, I moved to Hawaii

6.   I was single

7.   Now, I'm in a relationship

8.   It's going well

9.   Along the way, I've had sex

10.  I'm maturing

11.  I'm even reading

12.  But, mainly doing comedy

13.  Which is how I met Train

c.   Sean Donnelly – 2015 album entitled "Manual Labor Face" consisting of 19 tracks.

1.   Intro

2.   Hello Handsome

3.   I Want to Lose Weight

4.   Trying to Get Healthy

5.   I Want to Have Kids

6.   I Love My Bulldog

7.  Sleep Apnea

8.  No Toilet Paper

9.  Thug Barbershops and White Castles

10. Jobs and Netflix

11. My Mom and Dad

12. Sex Excuses

13. Spanish Guy

14. Wish I Was Gay

15. I Have No More Friends

16. Adam

17. No Stowage

18. Real Heckles

19. Bedskirts, Bathmats and Goodbye

89.   Plaintiffs currently own the copyrights to the respective underlying works referenced in the preceding paragraph.

90.   The underlying works referenced in paragraph 88 have been properly registered. True and correct copies of the Certificates of Registration for Mr. Zimmerman's, Mr. DeVito's, and Mr. Donnelly's respective works are attached hereto as **Exhibit G**.

91.   Without authorization or compensation, Defendants are willfully and unlawfully infringing on Plaintiffs' public performance copyright in violation of 17 U.S.C.A. §§ 106(6) and 114(G)(2)(D) through Defendants' refusal to account for and pay for Plaintiffs and the Class Members' share of revenue from the exploitation of the works generated from DEMD, including SiriusXM.

92.     These unauthorized public performances are distributed to and/or exploited by Defendants on such SDARS services such as SiriusXM.

93.     Defendants' infringement of Plaintiffs' rights in each of their copyrighted works constitutes a separate and distinct act of infringement.

94.     Defendants' acts of infringement are knowing, willful and intentional and in disregard of and indifference to Plaintiffs' rights. As set forth above, Defendants were aware of Plaintiffs' ownership in their public performance copyrights under 17 U.S.C.A. § 114(g)(2)(D); 17 U.S.C.A. § 106(6).

95.     As a direct and proximate result of Defendants' infringement of Plaintiffs' copyrights and exclusive rights under copyright, Plaintiffs are entitled to maximum statutory damages pursuant to 17 U.S.C. § 504(c) in the amount of $150,000 with respect to each work infringed, or such other amounts as may be proper under 17 U.S.C. § 504(c). Alternatively, at Plaintiffs' election, pursuant to 17 U.S.C. § 504(b), Plaintiffs are entitled to their actual damages, including Defendants' profits from the infringement, as will be proven at trial.

96.     Defendants, and each of them, are liable for statutory damages to Plaintiffs for each copyrighted work of Plaintiffs infringed by said Defendants, pursuant to 17 U.S.C. § 504(c). Furthermore, Plaintiffs are informed and believe, and upon that basis allege that each Defendant acts as described above are in willful violation of Plaintiffs' rights and statutory damages against each such willfully infringing defendant in the Court's discretion up to the amount of $150,000.00 for each of the works infringed should be assessed by the Court pursuant to 17 U.S.C. § 504 (c)(2). By reason of the foregoing, Plaintiffs have incurred, and will continue to incur, attorneys' fees and other costs in connection with the prosecution of its claims herein, which attorneys' fees and costs Plaintiffs are entitled to recover from the defendants, and each of them, herein.

97.     Defendants' conduct is causing and, unless enjoined by this Court, will continue to cause Plaintiffs great and irreparable injury that cannot be fully compensated or measured in money damages. Plaintiffs have no adequate remedy at law. Accordingly, Plaintiffs are entitled to a permanent injunction prohibiting infringement of Plaintiffs and Class members' copyrights and exclusive rights under copyright pursuant to 17 U.S.C. § 502.

## THIRD CLAIM

### (Breach of Fiduciary Duty)
### (On Behalf of Plaintiffs and All Class Members)

98.     Plaintiffs repeat and reallege each and every allegation contained in the paragraphs above as though fully set forth herein.

99.     The parties' otherwise ordinary business relationship was transformed into that of a fiduciary relationship by the existence of special circumstances. Specifically, having assured Plaintiffs, by way of their Agreement, that Plaintiffs would retain their rights to own and publicly perform their materials, and collect royalties from third parties based on the public performance of their works, Defendants subsequent unilateral undertaking of collecting Plaintiffs Featured Artist Share of the public performance royalties owed Plaintiffs and Class Members created a special relationship and imposed upon Defendants a fiduciary duty that included, but was not limited to, disclosing any direct deals that could affect Plaintiffs' ability to collect their featured artist share at the statutory rate through SoundExchange. Defendants further owed Plaintiffs and Class Members a fiduciary duty that included, but was not limited to, disclosing any conflicts of interest or competition arising from any direct deals that could affect Plaintiffs' ability to collect their featured artist share.

100.    Defendants breached their fiduciary duties to Plaintiffs and Class Members when they failed to disclose the direct deal with SiriusXM or potentially other third parties that

impermissibly sought to usurp the public performance royalties Plaintiffs and the Class Members would have otherwise been permitted to receive at the statutory rate through SoundExchange. Defendants thus systematically, knowingly, and intentionally failed to disclose the existence of its direct licensing agreements and failed to account for and pay revenue generated from direct licensing agreements with SiriusXM and potentially other parties to Plaintiffs and Class Members, resulting in an egregious, wrongful reduction of their income.

101.   A fiduciary relationship was also created when Defendants induced Plaintiffs and Class Members to sign the Agreements on the condition that they, Plaintiffs and Class Members, would retain their ability to collect their featured artist share of royalties based on that public performance through Sound Exchange. Plaintiffs would not have signed such an agreement had they known that an undisclosed, direct licensing deal in place that would affect their ability to collect their public performance royalties. Plaintiffs and Class Members put their trust in Defendants to honor Plaintiffs' retention of ownership that permitted them to publicly perform the comedy performance material and collect their share of the royalties based on that public performance.

102.   Defendants breached their fiduciary duties to Plaintiffs and Class Members when Defendants concealed from Plaintiffs and Class Members the existence of a pre-existing, secret direct licensing agreement between SiriusXM and potentially other third parties that impermissibly sought to usurp the public performance royalties they would have otherwise been permitted to receive at the statutory rate through SoundExchange. The special trust or confidence reposed between the parties, based on the terms of the Agreement regarding Plaintiffs' and Class Members' retained rights to collect their share of the public performance royalties, created a

fiduciary relationship that was breached when non-disclosure of the direct licensing deal caused Plaintiffs' and Class Members' royalties to be unlawfully misappropriated and unaccounted for.

103.    By reason of the foregoing, Plaintiffs have been damaged in an amount to be determined at trial.

104.    By reason of the foregoing, Plaintiffs also seek punitive and exemplary damages against Defendants.

## FOURTH CLAIM

**(Breach of Contract)**
**(On Behalf of Plaintiffs and All Class Members)**

105.    Plaintiffs repeat and reallege each and every allegation contained in the paragraphs above as though fully set forth herein.

106.    Plaintiffs and Class Members entered into Recording Agreements with Defendants or one of their affiliates.

107.    According to the Recording Agreements, a "Profit Participation" provision granted to the artist a share of the Company's net profits earned in connection with the exploitation of the Recordings delivered. The Contracts between Comedy Partners and the Class Members require Comedy Partners to accurately account for all "Net Profits" generated under the Contracts, and pay a portion of these "Net Profits" to the Class Members in accordance with the terms of the Contracts. Plaintiffs and other Class Members have performed their obligations under their respective Recording Agreements by providing services called for under the Recording Agreements and granting Defendants the requisite rights to distribute and exploit their Recordings. As a result, all conditions required for Defendants' performance under the Agreements—namely, the accounting and payment of money to Plaintiffs and Class Members sought herein—have occurred.

108.    Defendants have materially breached the Contracts between themselves and the Plaintiffs and Class Members by *inter alia*: (a) failing to properly account for the revenue Defendants receive for distribution of the Class Members' Recordings via SiriusXM and other DEMD; and (b) failing to pay Class Members their portion of revenues that Defendants receive for distribution of the Class Members' Recordings via SiriusXM and other DEMD.

109.    Defendants have failed to cure these breaches and continue to withhold revenues from Plaintiffs and Class Members, in violation of the terms of the Contracts.

110.    By reason of the foregoing breaches, Plaintiffs and other Class Members have been damaged in an amount to be determined at trial.

## FIFTH CLAIM

### (Breach of Covenant of Good Faith and Fair Dealing)
### (On Behalf of Plaintiffs and All Class Members)

111.    Plaintiffs repeat and reallege each and every allegation contained in the paragraphs above as though fully set forth herein.

112.    Plaintiffs and Class Members entered into Recording Agreements with Defendants or one of their predecessors-in-interest.

113.    Plaintiffs and Class Members performed all, or substantially all, of their obligations and conditions under the Agreements. As a result, all conditions required for Defendants' performance have occurred.

114.    Implied in the Agreements was a promise of good faith and fair dealing by which Plaintiffs and the Class Members, on the one hand, and Defendants, on the other hand, agreed not to do anything to unfairly interfere with the right of the other party to receive the benefits of the contracts.

115.    Defendants have unfairly interfered with Plaintiffs' and Class Members' right to receive the benefits of the agreements by, *inter alia*, knowingly concealing and/or failing to account for the revenue Defendants received for distributions of the Class Members' Recordings via SiriusXM and other DEMD. Defendants engaged in this conduct in order to prevent Class Members from discovering and receiving their portion of such revenues and discovering the existence of such revenues.

116.    By reason of the foregoing conduct, Plaintiffs and other Class Members have been damaged in an amount to be determined at trial.

## SIXTH CLAIM

**(Money Had and Received)**
**(On Behalf of Plaintiffs and All Class Members)**

117.    Plaintiffs repeat and reallege each and every allegation contained in the paragraphs above as though fully set forth herein.

118.    Defendants wrongfully received money from the revenue derived from performance royalties through their secret agreement with SiriusXM to which Defendants knew or should have known they were not entitled to collect or to receive. This money was, at least in substantial part, intended for the benefit and use of Plaintiffs and Class Members. The money was not properly used for the benefit and use of Plaintiffs and Class Members, however, and was instead wrongfully kept by Defendants.

119.    Defendants are indebted to Plaintiffs and Class Members for their rightful share of the money had and received by Defendants during the class period for the benefit and use of Plaintiffs and Class Members.

## SEVENTH CLAIM

### (Accounting)
### (On Behalf of Plaintiffs and All Class Members)

120.    Plaintiffs repeat and reallege each and every allegation contained in the paragraphs above as though fully set forth herein.

121.    Plaintiffs seek a formal accounting of the accounts for Plaintiffs and each and every Class Member, including but not limited to an accounting of all revenue and/or royalties collected by Defendants for any Recordings associated with Plaintiffs and the Class Members, regardless of whether or not such revenue and/or royalties were distributed by Defendants to Plaintiffs and the Class Members. Plaintiffs are informed and believe that such an accounting will reveal that Defendants have been secretly collecting and retaining performance royalties and/or other revenues, and/or permitting such royalties and/or other revenues to be diverted to another entity such as SiriusXM, due to Plaintiffs and the Class Members from SiriusXM and other DEMD, in violation of the Agreements and Defendants legal and contractual obligations.

## EIGHTH CLAIM

### (Unjust Enrichment)
### (On Behalf of Plaintiffs and All Class Members)

122.    Plaintiffs repeat and reallege each and every allegation contained in the paragraphs above as though fully set forth herein.

123.    In consideration for Plaintiffs' and the Class Members' agreement to license their property to Defendants pursuant to the Contracts, Defendants were required to pay a portion of the revenues generated from the distribution of Recordings via DEMD to Plaintiffs and Class Members.

124.     Defendants have wrongfully refused to abide by the terms of the Contracts because they have either unilaterally decided to keep a portion of DEMD revenue to which they are not entitled, or are receiving some other benefit while the DEMD revenue is diverted to another entity, and failed to account for and distribute any revenue to Plaintiffs and the Class Members. It would be unjust and inequitable to allow Defendants to benefit in this manner without remuneration to Plaintiffs and the Class Members.

125.     By reason of the foregoing, Defendants have been unjustly enriched at the expense of Plaintiffs and the Class Members and should be required to disgorge all monies they are not entitled to receive.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and the members of the Class, pray for:

1.     An order certifying the proposed Class, designating Plaintiffs as the named representative of the Class, and designating the undersigned as Class Counsel;

2.     A declaration that Defendants have no authority, contractual, statutory, or otherwise, to collect and retain revenues and money belonging to Plaintiffs and the Class Members, or such other relief as the Court may grant;

3.     Appropriate injunctive relief, including but not limited to an order permanently enjoining Defendants from retaining any percentage of such royalties unless Plaintiffs and the Class Members agree thereto; and requiring Defendants to account for all revenues to Plaintiffs and the Class Members in accordance with their contractual Agreements;

4.     Imposing a constructive trust on the money Defendants unlawfully collected from SiriusXM or any other digital music user for revenues owed to Plaintiffs and the Class Members;

5.     Ordering Defendants to return to Plaintiffs and the Class Members the legally entitled portion of revenues it has collected on their behalf, either directly or indirectly, that relate to DEMD;

6.      Awarding Plaintiffs and Class Members restitution for Defendants' prior acts;

7.     Awarding Plaintiffs and Class Members damages for Defendants' prior acts;

8.     Awarding Plaintiffs and the Class Members reasonable attorneys' fees and costs;

9.     On their Third Cause of Action, awarding Plaintiffs and the Class Members punitive damages in amount to be determined at trial;

10.     Awarding pre-judgment and post-judgment interest, as provided by law; and

11.      For such other, further, and different relief as the Court deems proper under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury to the extent that the allegations contained herein are triable by jury under Fed. R. Civ. P. 38 and 39.

Dated: March 21, 2023                              Respectfully Submitted,

/s/ Scott A. Kamber
Scott A. Kamber
skamber@kamberlaw.com
KAMBERLAW, LLC
201 Milwaukee Street, Suite 200
Denver, CO 80206
Phone: (646) 964-9600

 /s/ Benjamin J. Sweet
Benjamin J. Sweet
(*Pro hac vice petition forthcoming*)
ben@nshmlaw.com
**NYE, STIRLING, HALE, MILLER &
SWEET, LLP**
1145 Bower Hill Drive, Ste 104
Pittsburgh, PA 15243
Telephone: 412-857-5350


Jonathan D. Miller  (*Pro hac vice petition
forthcoming*)
jonathan@nshmlaw.com
Alison M. Bernal (*Pro hac vice petition
forthcoming*)
alison@nshmlaw.com
Margaret A. Parker (*Pro hac vice petition
forthcoming*)
meg@nshmlaw.com
**NYE, STIRLING, HALE, MILLER &
SWEET, LLP**
33 W. Mission Street, Suite 201
Santa Barbara, CA 93101
Phone: (805) 963-2345


*Attorneys for Plaintiffs and the Proposed
Class*